# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MARK SPRINGER**, <br><br> *Plaintiff* <br><br> v. <br><br> **GERALD KILHEFNER, et al.**, <br><br> *Defendants* | Case No. 5:19-cv-00552-JDW |

## MEMORANDUM

Defendants have moved to dismiss this case, invoking the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. The Court has applied those standards while being mindful that the circumstances of this action, focused on transactions in closely-held companies, make it different from the typical PSLRA case, which involves publicly-traded securities. *See Klein v. Autek Corp.*, 147 Fed. App'x 270, 274 (3d Cir. 2005) (recognizing narrow exception to PSLRA's stringent pleading standards for non-typical securities fraud cases). Having carefully reviewed the Amended Complaint and the Parties' arguments, the Court concludes that Plaintiff Mark Springer has stated a claim with the required particularity for misrepresentations about Springer's need to exercise stock options that he held pursuant to an employment agreement. However, Springer's allegations about other misrepresentations and omissions do not state viable securities claims. Accordingly, the Court will deny the motion to dismiss in order to permit Springer to pursue the single viable securities claim that he has pled, as well as his pendent state claims.

I. **FACTUAL BACKGROUND**

For purposes of resolving Defendants' Motion to Dismiss, the Court accepts as true all factual allegations in Springer's Amended Complaint. However, the Court does not consider the additional facts set forth in Springer's briefing, as "[i]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (quotation omitted).

A. **Springer's Relationship With Kilhefner And KCI**

In February 2014, Springer, Defendant Gerald Kilhefner, and Klover Contracting, Inc. ("KCI") executed two agreements related to Springer's minority ownership and employment with KCI. (ECF No. 7 ¶¶ 20, 23.) On February 6, 2014, the parties entered into a Shareholder's Agreement (the "Shareholders Agreement"). (*Id.* Ex B.) Then, on February 18, 2014, Springer, Kilhefner, and KCI entered into a Stock Option and Employment Agreement (the "Employment Agreement"). (*Id.* Ex A.) When those agreements were executed, Kilhefner was KCI's sole shareholder. (*Id.* ¶ 23.)

Pursuant to the Employment Agreement, KCI issued one share of common stock to Springer, and he became Vice President of operations and a director of KCI. (*Id.* ¶¶ 24-25.) His employment started on April 1, 2014. (*Id.* ¶ 38.) The Employment Agreement entitled Springer to receive an annual common stock distribution from KCI, as well as the right to receive a stock bonus distribution each year beginning in 2015. (*Id.* ¶¶ 26-27.) The Employment Agreement allowed Springer to defer his stock bonus, which would then accrue to the following year. (*Id.* ¶ 28.) If, however, Springer did not exercise his election to receive the stock bonus distribution with accrued options in the fourth year, 2018, he would forfeit his right to receive the accrued distributions and any further distributions. (*Id.*) The Employment Agreement also entitled

Springer to dividends based upon KCI's year-end net profits. (*Id.* ¶ 30.) Finally, the Employment Agreement provided that "any stock transfer tax, payable on the sale or transfer of all or any portion of the Purchased Stock or the consummation of any other transaction contemplated hereby shall be paid by distributions from [KCI]." (*Id.* ¶ 32.)

For most of the time that Springer was a KCI shareholder, Kilhefner did not provide Springer with periodic financial information about KCI, such as income statements or balance sheets. (*Id.* ¶ 37.) In addition, Springer contends that Kilhefner issued dividends to himself but not to Springer. (*Id.* ¶¶ 42-43.)

### B. Formation Of The Newcos And Related Misrepresentations And Omissions

In January 2017, Kilhefner incorporated four new companies, Klover Metro DC, Inc. ("MDC"), Klover Prefabrication PA, Inc. ("Prefab"), Skilled Trades Hiring, Inc. ("STH"), and Klover SEPA, Inc. ("SEPA") (collectively "Newco Defendants"). (*Id.* ¶ 44.) On February 23, 2017, Kilhefner met with Springer to discuss the Employment Agreement and Springer's right to exercise his KCI stock options (the "February Meeting"). (*Id.* ¶ 47.) In advance of that meeting, Kilhefner met with KCI's accountant to prepare a buyout plan, which Kilhefner intended to present to Springer at the February Meeting. (*Id.* ¶ 48.)

At the February Meeting, Kilhefner told Springer that KCI had a market value of $5 million and that Springer would incur a tax liability of $880,000 if Springer exercised his stock options. (*Id.* ¶¶ 51-53.) Kilhefner then presented to Springer the proposed buyout plan, pursuant to which one or more of the Newco Defendants would purchase KCI's assets (the "Buyout Plan"). Kilhefner claimed during the February Meeting that the Buyout Plan would permit Springer to receive an ownership in the Newco Defendants without having the tax liability that he would face from exercising his stock options in KCI.

Springer alleges that the statements that Kilhefner made at the February Meeting were false, and that Kilhefner knew that they were false. In particular, he avers that Kilhefner knew that the Shareholder's Agreement obligated KCI "to pay any Tax Liability related to Plaintiff's exercise of his options." (*Id.* ¶ 62.) According to Springer, Kilhefner made those false statements to deter Springer from exercising his stock options and to ensure that KCI did not have to pay Springer's tax bill. (*Id.* ¶¶ 64, 67.) Similarly, Springer contends that Kilhefner's statements at the February Meeting about the value of any potential interest in the Newco Defendants was false. (*Id.* ¶ 65.)

On March 31, 2017, the Newco Defendants held board meetings (the "March Board Meetings"). During those meetings, Kilhefner awarded a 40% ownership in each company to Springer and made Springer an officer of each company. (*Id.* ¶¶ 68-69.) Kilhefner also proposed during those meetings that (a) SEPA would purchase KCI's outstanding shares from Kilhefner for $5 million, (b) Kilhefner would carry a note for the full purchase price for a ten-year loan at 3.25% paid monthly, and (c) the outstanding shares of all of the Newco Defendants would serve as collateral for the loan. (*Id.* ¶ 71.) This deal differed materially from the deal that Kilhefner proposed at the February Meeting, in that it was a stock sale rather than an asset purchase.

According to Springer, Kilhefner altered the structure of the deal in order to avoid handing 40% of KCI's value to Springer for nothing, to avoid KCI's potential tax liability if Springer exercised his options to acquire KCI's shares, and to reduce the value of potential distributions from KCI if Springer exercised his options. (*Id.* ¶ 79.) Nonetheless, Springer agreed to the terms that Kilhefner proposed at the March Board Meetings. (*Id.* ¶ 85.)

Following the March Board Meetings, Kilhefner issued to Springer share certificates for each of the Newco Defendants. (*Id.* ¶ 86.) Kilhefner also represented to Springer that Springer would continue to be employed under the Employment Agreement with KCI and that Springer did

4

not need to elect to receive his accrued but unelected stock in KCI. (*Id.* ¶ 87.) Springer believed Kilhefner, and he therefore did not exercise his stock options to receive stock in KCI. (*Id.* ¶ 88.) According to Springer, however, Kilhefner's representations were false. Indeed, Springer now contends that his 40% interest in the Newco Defendants was worth less than his interest in KCI would have been, he would not receive cash distributions from the Newcos because those companies' cash would go to repay the loan from Kilhefner, and Springer would still incur a tax liability. (*Id.* ¶¶ 87, 89.)

Over a year later, on April 18, 2018, Kilhefner asked Springer to sign a Memorandum of Understanding to clarify the relationship between Springer, Kilhefner, and the various companies for which Kilhefner was the majority shareholder (the "MOU"). (*Id.* ¶ 92 & Ex. K.) The MOU explains that because Springer decided not to exercise his accrued stock bonus distribution from KCI, he had forfeited his current stock options as well as any future distributions in any of the companies Kilhefner owned as majority shareholder. (*Id.* ¶ 93.) The MOU also requires Springer to return the share certificates for the Newco Defendants and pay SEPA $61,488.00 for estimated tax payments that KCI made on Springer's behalf. (*Id.* ¶ 94.)

Springer refused to sign the MOU, and Kilhefner "reneged" on the deal that he and Springer had agreed to. (*Id.* ¶ 96.) Kilhefner refused to recognize Springer's 40% ownership interest in the Newco Defendants and instead held himself out as their sole owner. (*Id.*) Kilhefner and the other Defendants cancelled, revoked, or terminated Springer's shares and his corresponding 40% interest in the Newco Defendants. (*Id.* ¶ 97.) Finally, on February 4, 2019, Springer received a letter terminating his employment, effective that day. (*Id.* ¶ 98.)

C. **The Present Lawsuit**

Springer contends that he suffered damages in the amount of $2 million as a result of Kilhefner's fraudulent, false, and misleading statements, made in Kilhefner's individual capacity and on behalf of KCI and the Newco Defendants. (*Id.* ¶ 83.) He brought suit against Kilhefner, KCI, and the Newco Defendants, alleging securities fraud under Section 10(b) of the Securities and Exchange Act of 1934, as well as various related state law claims. On April 26, 2019, Defendants moved to dismiss Springer's securities fraud claim in Count I of his Amended Complaint, arguing that Springer has failed to meet the heightened pleading requirements to sustain such a claim. (ECF No. 11 at 8-18.) In addition, Defendants contend that once the securities fraud claim is dismissed, the Court may no longer exercise supplemental jurisdiction over Springer's remaining state law claims. (*Id.* at 18-19.) Finally, Defendants ask the Court to impose sanctions on Springer for brining a frivolous securities fraud claim. (*Id.* at 19-20.)

## II. LEGAL STANDARD

Because this motion arises under the PSLRA, the inquiry is more searching than for an ordinary motion to dismiss. Ordinarily, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (quotation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (same). The court must "construe those truths in the light most favorable to the plaintiff, and then draw all reasonable inferences from them." *Id.* at 790 (citations omitted).

Federal Rule of Civil Procedure 9(b) imposes additional requirements when plaintiffs assert fraud claims. When alleging fraud, "a party must state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b). This requires plaintiffs to "support their allegations of securities fraud with . . . the who, what, when, where and how of the events at issue." *In re*

*Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006) (quotation omitted). All securities fraud claims are subject to the pleading requirements of Rule 9(b). *Williams v. Globus Med., Inc.*, 869 F.3d 235, 240 (3d Cir. 2017). "As applied to Section 10(b) claims, 'Rule 9(b) requires a plaintiff to plead (1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage.'" *In re Suprema Specialties*, 438 F.3d at 276 (quotation omitted).

The PSLRA imposes additional pleading requirements. *See Williams*, 869 F.3d at 240. "First, the complaint must specify each allegedly misleading statement, why the statement was misleading, and if an allegation is made on information and belief, all facts supporting that belief with particularity. Second, the complaint must with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at 240-41 (quotations omitted). "A complaint adequately pleads a strong inference of scienter 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018) (quotation omitted). This does not require the plaintiff to come forward with "smoking-gun" evidence. *Id.* (citation omitted). Rather, "in conducting the scienter analysis, courts must analyze the complaint holistically to determine whether its allegations, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* (quotation omitted). Thus, while in most fraud cases, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally" (Fed. R. Civ. P.

7

9(b)), "the PSLRA supersedes Rule 9(b) as it relates to Rule 10b-5 actions." *In re Suprema Specialties*, 438 F.3d at 277 (quotation omitted).

## III. ANAYLSIS

### A. Pleading of Section 10(b) Claims

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe . . .." 15 U.S.C. § 78j(b). In turn, the Securities and Exchange Commission promulgated Rule 10b-5, which makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. "To adequately allege a § 10(b) securities fraud claim, a plaintiff must plead (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *In re Hertz*, 905 F.3d at 114 (quotation omitted). Defendants do not challenge the materiality of the alleged misrepresentations and omissions. Thus, for purposes of deciding the motion, the Court assumes that each of the alleged misrepresentations and omissions were "material," unless otherwise noted. Applying these standards, the Court discusses each alleged misrepresentation or omission on which Springer bases Count I of his Amended Complaint.

### 1. Kilhefner's misrepresentations to Springer about the need to exercise accrued stock options

Springer alleges that Kilhefner told him that he would remain a KCI employee under the Employment Agreement and that Springer did not need to elect to receive his accrued but unelected stock bonus distributions. (ECF No. 7 ¶ 87.) Consistent with the PSLRA's requirements, the Amended Complaint identifies the misleading statement. As set forth above, the Court assumes that this misrepresentation was material. The Complaint also identifies why the statement was misleading by alleging that more than a year later, Kilhefner presented Springer with the MOU, which states that Springer forfeited his stock options by failing to exercise them. (*Id.* ¶¶ 92-93.) Moreover, Defendants have refused to recognize Springer's ownership interest in, and have terminated his shares of, the Newco Defendants. (*Id.* ¶¶ 96-97.) Springer also pled fraud with the requisite particularity, pleading the who (Kilhefner), the what (the misrepresentation), the when (February 23 and March 31, 2017), the where (McCool's Red Lion Inn and Kilhefner's office), and the how of the alleged fraud.

Springer has also alleged scienter. As an initial matter, the PSLRA's exacting pleading standards are somewhat relaxed in non-typical securities fraud cases such as this. *See Klein*, 147 Fed. App'x at 274 (recognizing narrow exception to PSLRA's stringent pleading standards for non-typical securities fraud cases); *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 885 (3d Cir. 2000) (finding that district court applied PSLRA requirements "too restrictively" at pleading stage and explaining that "application of certain legal requirements must be adjusted to fit the particular action"). "[T]he distinction between the fact pattern alleged here and that in the typical securities cases explains why it is difficult to apply the precedent from those cases to many of the issues. It is like the proverbial difficulty of fitting a square peg in a round hole." *EP Medsystems*, 235 F.3d at 871-72.

Kilhefner kept Springer "in the dark" while developing the terms of the Buyout Plan. (ECF No. 7 ¶¶ 49, 66.) Then, after the initial discussions during the February Meeting, Kilhefner revised the terms of the Buyout Plan without Springer's input. Indeed, the Board Minutes from the March Board Meetings were inconsistent with the terms that Kilhefner and Springer discussed during the February Meeting. (*Id.* ¶ 78.) When Kilhefner presented both the initial and revised deal terms to Springer, he made the alleged misrepresentations to deceive Springer and prevent Springer from exercising his stock options. (*Id.* ¶¶ 67-68, 84-85.) According to Springer, Kilhefner made these misrepresentations for personal gain. For example, by convincing Springer to agree to the Buyout Plan, Kilhefner avoided handing the shares to Springer for free and, instead, ensured that he received value for Springer's 40% interest. (*Id.* ¶ 79.) Kilhefner also avoided diminished distributions from KCI when Springer declined to exercise his stock options, thereby saving KCI from having to cover the resulting tax liability. (*Id.*) He also stood to earn 3.25% interest on the $5M loan to SEPA. (*Id.* ¶ 71.) Furthermore, after Kilhefner told Springer that it was not necessary for him to exercise his accrued stock options, Kilhefner then invoked the forfeiture provisions of the Employment Agreement, refused to recognize Springer's 40% ownership interest in the Newco Defendants, and began holding himself out as the sole shareholder. (*Id.* ¶¶ 93, 96-97.)

Viewed in isolation, these facts might not satisfy the PSLRA's exacting pleading standards. When viewed as a whole, however, these facts, including those that demonstrate Kilhefner's motive and opportunity, give rise to a cogent inference of scienter. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007) ("[M]otive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference[.]"). Indeed, the inferences supporting scienter are "at least as compelling as any opposing inference one could draw from the facts alleged." *In re Hertz,* 905 F.3d at 114 (quotation omitted).

10

Springer also alleged that Kilhefner made the alleged misrepresentations in connection with the purchase or sale of a security. The Supreme Court has explained that Section 10(b) "should be 'construed not technically and restrictively, but flexibly to effectuate its remedial purposes.'" *S.E.C. v. Zandford*, 535 U.S. 813, 819 (2002) (quotation omitted). As an initial matter, a stock option constitutes a "security" under the statute. *See* 15 U.S.C. § 78c(a)(10) ("The term 'security' means any . . . option . . . on any security . . ."). Moreover, "[t]he terms 'buy' and 'purchase' each include any contract to buy, purchase, or **otherwise acquire**." 15 U.S.C. § 78c(a)(13) (emphasis added). Likewise, "[t]he terms 'sale' and 'sell' each include any contract to sell or **otherwise dispose of**." 15 U.S.C. § 78c(a)(14) (emphasis added). Like the injured parties in *Zandford*, Springer has alleged that he was injured as an investor through Kilhefner's deceptions, which deprived him of any value for his securities in KCI and the Newco Defendants. Consistent with the broad construction of "in connection with the purchase or sale of any security[,]" the Court concludes that Springer has pled this element of a Section 10(b) claim.

Likewise, Springer has pled reasonable reliance on Kilhefner's alleged misrepresentations. When assessing the reasonableness of a plaintiff's reliance on an alleged misrepresentation or omission, the court may consider factors such as the presence of a "fiduciary relationship, [the] opportunity to detect the fraud, [the] sophistication of the plaintiff, the existence of long standing business or personal relationships, and access to the relevant information . . . ." *Straub v. Vaisman & Co.*, 540 F.2d 591, 598 (3d Cir. 1976). Springer's reliance on Kilhefner's misrepresentation was reasonable. First, as the majority shareholder, Kilhefner owed fiduciary duties to Springer. *See Seven Springs Farm, Inc. v. Croker*, 748 A.2d 740, 756 (Pa. Super. Ct. 2000), *aff'd*, 801 A.2d 1212 (Pa. 2002). Second, Kilhefner was much more familiar with the terms of the deal, as he developed the Buyout Plan and revised it on his own without any input from Springer. (ECF No.

7 ¶¶ 49, 66.) Third, even if Springer was a "sophisticated businessman with intimate knowledge of the Klover Companies and their finances[,]" as Defendants contend (ECF No. 11 at 16), "a sophisticated investor is not barred by reliance upon the honesty of those with whom he deals in the absence of knowledge that the trust is misplaced." *Straub*, 540 F.2d at 598. Indeed, no amount of independent investigation or due diligence would have alerted Springer that Kilhefner would reverse course and invoke the forfeiture provisions of the Employment Agreement a year after telling Springer that he no longer needed to exercise his stock options. Thus, Springer has pled reasonable reliance.

Relatedly, Springer has pled that he suffered an economic loss that resulted from his reliance on Kilhefner's misrepresentations—a loss of $2M in value in KCI and the Newco Defendants. (ECF No. 7 ¶¶ 82-83.) Contrary to Kilhefner's assertions, Springer need not plead a decline in the securities' price or a loss in their value in order to sustain his securities fraud claim. As the Third Circuit has recognized, "in a non-typical § 10(b) action, where the plaintiff does not simply allege that the price of a publicly-traded security has been affected, the factual predicates of loss causation fall into less of a rigid pattern." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007). In this non-typical case, Springer's allegations are sufficient. *See, e.g.*, *EP Medsystems*, 235 F.3d 865, 884-85.

Finally, Springer has pled enough facts to impute Kilhefner's alleged fraud to the other Defendants at this stage of the proceedings. "[T]he fraud of an officer of a corporation is imputed to the corporation when the officer's fraudulent contact was (1) in the course of his employment, and (2) for the benefit of the corporation." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 494 (3d Cir. 2013) (quotation omitted). Because "a corporation can speak and act only through its agents[,]" it "must be accountable for any acts committed by one of its agents within his actual or

apparent scope of authority and while transacting corporate business." *Id.* (same). In his Amended Complaint, Springer alleged that Kilhefner perpetrated the alleged fraud on behalf of KCI and the Newco Defendants and that he did so within the scope of his authority as an employee, officer, and director. (ECF No. 7 ¶¶ 65-67, 83-84, 106.) Springer also alleged that Kilhefner made the false statements to benefit himself and KCI. (*Id.* ¶ 60.) Construing all reasonable inferences in Springer's favor, the Court infers that Kilhefner intended to benefit the Newco Defendants as well. Thus, Kilhefner's alleged fraud may be imputed to KCI and the Newco Defendants.

> 2. **Kilhefner's failure to disclose that Springer's interest in the Newco Defendants was worth less than his potential interest in KCI**

In addition to making the affirmative misrepresentations discussed above, Kilhefner also failed to inform Springer that the 40% interest in the Newco Defendants was worth much less than his 40% interest in KCI. (ECF No. 7 ¶ 89.) Kilhefner had a duty to disclose that fact. *See Williams*, 869 F.3d at 241 (a duty to disclose exists "when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure"). Drawing all reasonable inferences in the light most favorable to Springer, the Court infers that during the February Meeting, Kilhefner led Springer to believe that the Buyout Plan would not diminish the value of Springer's ownership interest.

However, as set forth in the Amended Complaint, Kilhefner corrected the misleading omission during the March Board Meetings. Indeed, Springer admits that the Board Minutes, prepared by Kilhefner, disclosed the revised terms of the deal, including those that would render Springer's interest in the Newco Defendants worth less than his interest in KCI. (ECF No. 7 ¶ 89.) This subsequent disclosure cured the misleading nature of the alleged omission. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 181 (3d Cir. 2000); *Weiner v. Quaker Oats Co.*, 129 F.3d 310,

13

321 (3d Cir. 1997); *In re NAHC, Inc. Sec. Litig.*, No. 00-cv-4020, 2001 WL 1241007, *16 (E.D. Pa. Oct. 17, 2001), *aff'd*, 306 F.3d 1314 (3d Cir. 2002).

In his opposition brief, Springer asserts—for the first time—that "[t]here were no Board Meetings of any of the Klover Entities." (ECF No. 12 at 14.) Rather, Springer contends that Kilhefner prepared the Board Minutes, presented them to Springer, stated that the Board Minutes memorialized the Buyout Plan as discussed during the February Meeting, and directed Springer to sign-off on the Board Minutes without allowing him sufficient time to review and analyze their contents. (*Id.*) These new assertions contradict allegations in Springer's Amended Complaint that "Kilhefner called the regular board meetings for the NewCos[,]" during which he awarded Springer a 40% interest in each of the Newco Defendants, moved to make Springer a director and officer of each, and made various proposals related to the structure of the deal. (ECF No. 7 ¶¶ 68-73.) Moreover, the Amended Complaint alleges that the Board Minutes reflected the agreed-upon deal between Kilhefner and Springer. (*Id.* ¶ 96.) Nowhere does the Amended Complaint allege that Kilhefner prevented Springer from reviewing the Board Minutes or otherwise shielded him from the deal terms contained therein.

### 3. Kilhefner's misrepresentations regarding Springer's tax liability

Springer has failed to plead a plausible securities fraud violation based on Kilhefner's alleged misrepresentations that Springer, rather than KCI, would be required to pay the taxes as a result of exercising his stock options and that the Buyout Plan would save Springer from this tax liability. "It is axiomatic that a private action for securities fraud must be dismissed when a plaintiff fails to plead that he or she reasonably and justifiably relied on an alleged misrepresentation." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 174 (3d Cir. 2001) (quotation omitted). In addition to the "reasonableness" considerations identified

14

in *Straub*, 540 F.2d at 598, a defendant may demonstrate that an investor's reliance was unreasonable by showing that "the investor knew, or had reason to know, that the misrepresentations were in fact false." *Semerenko*, 223 F.3d at 179 n.8 (citations omitted). Springer failed to plead reasonable reliance with respect to the alleged misrepresentations regarding his potential tax liability.

Courts within the Third Circuit dismiss securities fraud claims for failure to plead reasonable reliance where the plaintiff had an opportunity to detect the alleged fraud and had access to relevant information. *See, e.g.*, *Fulton Fin. Advisors, Nat. Ass'n v. NatCity Investments, Inc.*, No. 09-cv-4855, 2013 WL 5635977, *14 (E.D. Pa. Oct. 15, 2013); *Fulton Bank, N.A. v. UBS Sec., LLC*, No. 10-cv-1093, 2011 WL 5386376, *11 (E.D. Pa. Nov. 7, 2011); *Olivet Boys' & Girls' Club of Reading v. Wachovia Bank, N.A.*, No. 08-cv-4702, 2009 WL 1911049, *4 (E.D. Pa. July 1, 2009); *Leder v. Shinfeld*, 609 F. Supp. 2d 386, 403 (E.D. Pa. 2009); *Leder v. Shinfeld*, No. 06-cv-1805, 2008 WL 2165097, *8 (E.D. Pa. May 22, 2008).

Similar to those cases, the Court finds that it was unreasonable for Springer to rely on Kilhefner's alleged misrepresentations relating to Springer's personal tax liability. Springer had access to the Employment Agreement, to which he was a party, and which he says is the source of KCI's obligation to pay his tax liability. (*Id.* ¶¶ 22, 32.) In any event, it was unreasonable for Springer to rely on Kilhefner's representations without conducting any independent investigation or consulting an accountant, attorney, or another advisor. Springer therefore cannot base his securities fraud claim on Kilhefner's alleged misrepresentations relating to the tax issue.

4. **Kilhefner's changes to and representations about the terms of the Buyout Plan**

As set forth above, Springer contends for the first time in his opposition brief that no board meetings ever took place in March 2017. (ECF No. 12 at 14.) Instead, he alleges that Kilhefner

15

drafted the Board Minutes in advance, told Springer that they memorialized the Buyout Plan as discussed during the February Meeting, and pressured Springer to approve them. (*Id.*) Because Kilhefner insisted that Springer sign the Board Minutes without giving him sufficient time to review them, Springer contends that he was unaware that Kilhefner had made substantial changes to the terms of the proposed Buyout Plan. (*Id.*) He therefore contends that Kilhefner's statement that the Board Minutes memorialized the terms of the Buyout Plan as discussed during the February Meeting is an actionable misrepresentation and that Kilhefner's failure to disclose the material changes to the Buyout Plan is an actionable omission. (*Id.*) Again, these allegations do not appear in the Amended Complaint. In fact, they contradict the allegations in the Amended Complaint. For example, in the Amended Complaint, Springer contends that he relied upon the terms of the deal set forth in the Board Minutes and agreed upon them. (ECF No. 7 ¶¶ 88, 96.) They therefore cannot form a basis for a securities fraud claim.

### B. Defendants' Remaining Arguments

Because Defendants contend that Springer has failed to state a claim under Section 10(b), they argue that the Court no longer has supplemental jurisdiction over his remaining state law claims. (ECF No. 11 at 18-19.) However, this argument fails, as the Court has determined that Springer pled sufficient facts to support a Section 10(b) claim. Thus, the Court has original jurisdiction over the securities fraud claim and may continue to exercise supplemental jurisdiction over Springer's related state law claims. *See* 28 U.S.C. §§ 1331, 1367(a).

Finally, Defendants ask the Court to award sanctions against Springer. (ECF No. 11 at 20.) In doing so, they rely on a provision of the PSLRA that provides that "[i]n any private action arising under this chapter, **upon final adjudication of the action**, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any

party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure . . . ." 15 U.S.C. § 78u-4(c)(1) (emphasis added). Because the Court is denying Defendants' Motion to Dismiss, there has been no final adjudication of this action, and the mandatory review provision has not been triggered. Therefore, the Court will not conduct a Rule 11 analysis at this time.

## IV. CONCLUSION

Because Springer has alleged at least one plausible misrepresentation in accordance with the governing pleading requirements, the Court will deny Defendants' Motion to Dismiss Springer's security fraud claim and related request for sanctions. The Court therefore retains original jurisdiction over this matter and may continue to exercise supplemental jurisdiction over Springer's related state law claims. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.